UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, <br><br> Plaintiff, <br><br> v. <br><br> Michael Eugene Hunter (2), <br><br> Defendant. | Case No. 20-cr-136 (WMW/HB) <br><br><br> **REPORT AND RECOMMENDATION** |

Daniel C. Guererro, Meshbesher & Spence, Ltd., 1616 Park Avenue South, Minneapolis, Minnesota 55404, for Defendant Michael Eugene Hunter

Benjamin Bejar, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415 for the United States of America

HILDY BOWBEER, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on Defendant Michael Eugene Hunter's Motion to Suppress Statements [ECF No. 41].[1] On July 14, 2020, Hunter was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). (Indictment at 1–2 [ECF No. 1].) He filed this motion on August 13, 2020. The motion was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. The Court held a hearing on the motion on October 15, 2020. Counsel

---

[1] The Defendant's non-dispositive motions were addressed in a separate Order [ECF No. 65].

for both sides opted to make oral arguments at the close of the hearing,[2] and filed post-hearing letters with supplemental case citations on October 23, 2020 [ECF Nos. 67, 68], at which time the Court took the motion under advisement. For the reasons set forth below, the Court recommends the motion be denied.

I.   **Background**

   A.   **Factual Background**

Officer Andrew Schroeder is an investigator with the Minneapolis Police Department. In late April or early May, 2020, Officer Schroeder observed one or more videos posted to social media in which certain "known individuals" posed holding a firearm. Officer Schroeder recognized one of the men as Defendant Michael Hunter. He knew that Hunter had prior felony convictions that made him ineligible to lawfully possess a firearm or ammunition, so he began an investigation. As a result of the investigation, Hunter was arrested on May 21, 2020.

Hunter was interrogated that evening at the Minneapolis Police Department Fourth Precinct. (Gov't Ex. 2.[3]) The interview began with Officer Schroeder entering the room,

---

[2] The parties did not order an official copy of the transcript. The Court relies on an unofficial transcript and its notes in order to establish the parties' arguments.

[3] Gov't Ex. 2 is a video recording of Officer Schroeder's interrogation of Hunter. It was submitted to the Court electronically and was admitted during the evidentiary hearing on October 15, 2020. The video is 24 minutes and 23 seconds long. It begins before Officer Schroeder enters the interview room and concludes after Hunter provides a DNA cheek swab and Officer Schroeder ends the interview. The video was recorded by Officer Schroeder's body-worn camera, which he took off and propped up on the table in view of both men. All citations refer to the in-video time stamp in the top right corner of the screen.

2

saying, "Michael Hunter. I haven't seen you for a minute." (*Id.* at 22:06:12.) They exchanged small talk ("What's up with you? Did you know this was comin or what?") and Officer Schroeder asked Hunter administrative questions, such the correct spelling of Hunter's name, and his address and birthdate. (*Id.* at 22:06:25.)

Officer Schroeder then had the following exchange with Hunter before reading him the *Miranda* warnings:

| | |
|---|---|
| Schroeder: | Alright, dude. Here's the thing, I can already tell you're nervous, alright? |
| Hunter: | Nervous for what? |
| Schroeder: | I don't know. Cause you're fuckin talking to the police or something, right? I've known you for a really long time. How long have I known you? Since you—how old are you now? . . . I've known you since you were probably frickin 12, right? No? Yeah, I've probably known you ten years, dude. Since you were a little boy. How many times we talked? |
| Hunter: | I don't even know. |
| Schroeder: | A lot, bro. So, OK, I'm gonna just lay this out, I'm gonna be real honest with you, I'm not gonna lie to you about anything, OK? I'm gonna tell you the God's honest truth, I'm gonna put it all on the table. I ain't tryin to fuckin hide no cards, nothin like—nothing like that, OK? |
| Hunter: | Uh huh. |
| Schroeder: | . . . You've obviously been arrested before. You just got off the paper, right? You were in the joint for, what, a robbery? |
| Hunter: | Yeah. |
| Schroeder: | Ok, so you've had your rights read to you? |
| Hunter: | Yeah. |
| Schroeder: | You understand your rights? |
| Hunter: | Yeah. |
| Schroeder: | OK. I've got to read them to you again. It's just a formality. |

(*Id.* at 22:07:00–22:08:01.) That portion of the conversation lasted almost exactly one

3

minute.

Officer Schroeder then read Hunter the *Miranda* warnings from a card. (*Id.* at 22:08:02.) He asked Hunter if he understood the warnings. Hunter can be seen on the video nodding but did not give a verbal answer. (*Id.* at 22:08:13.) Officer Schroeder then asked, "Do you want to talk to me about what's going on?" and Hunter said, "'About what's going on'—what you mean?" (*Id.* at 22:08:20.) Officer Schroeder responded, "I mean, yes, you're willing to sit here and have a conversation with me?" to which Hunter replied, "mmhmm." (*Id.* at 22:08:27.) Officer Schroeder then proceeded with the interrogation, during which Hunter made several potentially incriminating statements.

The interrogation lasted less than 25 minutes. Officer Schroeder and Hunter were the only two people in the room, and Hunter was not handcuffed at any time during the interrogation. At one point Officer Schroeder left the room to print out a copy of a co-defendant's statement in order to show it to Hunter. (*Id.* at 22:17:29–22:20:24.) He was out of the room for approximately three minutes, during which time Hunter remained alone in the interrogation room. (*Id.*)

**II.     Discussion**

Under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Those procedural safeguards are met when, "[p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make

4

may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

*Miranda* warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California*, 511 U.S. 318, 322 (1994). Once warned, a person can waive his *Miranda* rights, but only if the decision is made "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. Such a waiver is only valid if it is free from any "intimidation, coercion or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Jones*, 23 F.3d 1307, 1313 (8th Cir. 1994). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Hunter seeks to have the Court suppress his statements to Officer Schroeder on the ground that, given the totality of the circumstances, Hunter did not knowingly and voluntarily waive his *Miranda* rights. Hunter raises two specific challenges. First, he argues that that Officer Schroeder's conduct "disarmed" Hunter by engaging Hunter in friendly conversation before questioning him, and by reading the *Miranda* warnings quickly and in a "cavalier" manner. Second, he argues Officer Schroeder failed to elicit an explicit, verbal waiver from Hunter, or otherwise confirm he intended to waive his rights.

5

Hunter's first argument centers on the two-minute conversation Hunter and Officer Schroeder had before the officer read Hunter the *Miranda* warnings. The Court does not understand Hunter to be making an argument that Officer Schroeder intentionally engaged in the two-step 'question first and warn later' approach prohibited by *Missouri v. Seibert*, 542 U.S. 600 (2004)—namely because Hunter made no incriminating statements in the brief conversation before he was Mirandized. Instead, Hunter's argument is that Officer Schroeder's friendly behavior instilled a sense of trust in Hunter that led him to make incriminating statements even after receiving the warnings.

Statements to law enforcement officers are voluntary if they are "the product of an essentially free and unconstrained choice by [their] maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (internal quotation omitted). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotation omitted). Officer Schroeder's initial interactions with Hunter were largely general administrative questions and small talk. Such conversation is permissible pre-*Miranda* as routine and serving an administrative purpose. *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990).

Hunter points specifically to those of Officer Schroeder's statements that evoked a sense of familiarity between the two men, such as "I can already tell you're nervous" (Gov't Ex. 2 at 22:07: 01) and "I've known you since you were probably frickin 12, right? No? Yeah, I've probably known you ten years" (*Id.* at 22:07:22). But Hunter

6

provides no authority—and the Court could find none—for the proposition that an officer's friendliness or pre-existing relationship with a suspect is a coercive force sufficient to undermine the suspect's ability to make an informed and unconstrained waiver. Indeed, the Supreme Court has made it clear that "the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (finding that police officer's questions about the suspect's religious beliefs such as "Do you believe in God?" and "Do you pray to God to forgive you for shooting that boy down?" were not official coercion). The Court similarly cannot conclude that the history between Officer Schroeder and Hunter evoked by Officer Schroeder's initial comments was a source of official coercion.

Instead, this Court must consider the totality of the circumstances to determine if Hunter's will was overborne, including, "among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (internal quotation omitted). These factors all suggest that Hunter's will was not overborne in the course of the interrogation—including that portion that occurred before the *Miranda* warnings were administered. Although the interrogation was conducted in a windowless room in the police station, Hunter was not handcuffed or otherwise restrained. The entire interaction lasted less than 25 minutes and included a brief break wherein Hunter was alone in the room. Hunter is a young man of apparently good health and mental condition. There is no evidence he was intoxicated or

7

otherwise unable to appreciate the gravity of the situation. Moreover, in their pre-*Miranda* conversation, Officer Schroeder did not press Hunter regarding any evidence or inconsistencies in his statement, and he did not reference any of Hunter's pre-warning statements during post-warning questioning.

Hunter also argues that the *Miranda* warnings he received were administered very rapidly and in a "cavalier" manner. He notes that Officer Schroeder described the warnings as "just a formality" before he read them, which Hunter argues served to downplay the significance of waiving his *Miranda* rights. The Government points out that Hunter had had previous interactions with the criminal justice system—a fact of which Officer Schroeder was aware—so Hunter was likely already familiar with the *Miranda* warnings. In evaluating whether Hunter's waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *Jones*, 23 F.3d at 1313, a defendant's previous experience with the criminal justice system is a relevant factor. *See, e.g., United States v. Van Phong Nguyen*, 608 F.3d 368, 374–75 (8th Cir. 2010) (considering that the suspect was an "articulate adult who had significant experience with the criminal justice system" when determining that a waiver was effective).

Additionally, just before reading Hunter his rights, Officer Schroeder confirmed Hunter was familiar with the rights and understood them:

> Schroeder: You've obviously been arrested before. You've just got off the paper, right?
> Hunter: Mmhmm
> Schroeder: You were in the joint for what? Robbery?

   Hunter:   Yeah.

   Schroeder:  OK, so you've had your rights read to you?

   Hunter:   Yeah.

   Schroeder:  You understand your rights?

   Hunter:   Yeah.

   Schroeder:  OK. I've got to read them to you again. It's just a formality.

(Gov't Ex. 2 at 22:07:50–22:08:02.)

   The record does not support a finding that Hunter's statement to law enforcement was involuntary or unknowing. The Supreme Court has made it clear that the *Miranda* warnings are meant to convey "essential information," but that the precise wording or "formulation" of the warnings is not dictated. *See Florida v. Powell*, 559 U.S. 50, 60 (2010). "The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Id.* (internal quotation omitted). Although the Court agrees that Officer Schroder read the *Miranda* warning in a rushed manner, the words were still clear and understandable. The Court concludes that the warning, coupled with Schroeder's introductory comments confirming that Hunter had heard the warnings before, gave Hunter the requisite 'level of comprehension' to effect a valid waiver. *See Moran*, 475 U.S. at 421. Based on the evidence in the record, the Court concludes Officer Schroeder reasonably conveyed Hunter's constitutional rights.

   Hunter's second argument in support of suppressing his statements to Officer Schroeder is that Hunter never waived his *Miranda* rights because Schroeder "did not receive or require a yes or no answer" after reading to Hunter from the card. After Schroeder read the rights, he said, "Do you understand all that?" and Hunter nodded

silently. (Gov't Ex. 2 at 22:08:13.) Schroeder then said, "I'm gonna show you some pictures and some videos and we're gonna have a conversation, OK? You want to talk to me about what's going on?" (*Id.* at 22:08:16.) Hunter responded, "'About what's going on'—what you mean?" (*Id.* at 22:08:20.) Schroeder said, "I mean, you're willing to sit here and have a conversation with me?" (*Id.* at 22:08:27.) Hunter then mumbled "mmhmm" and Schroeder responded "OK," and proceeded with the conversation.

The Supreme Court has held that law enforcement officers are not required to obtain a verbal waiver of the right to remain silent before beginning questioning. *Berghuis*, 560 U.S. at 387. Instead, waiver can be inferred from the suspect's words and actions. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). There is a valid waiver in cases where, as here, after receiving the warnings, a suspect continues to speak "freely and without hesitation or reluctance." *Martin v. United States*, 691 F.2d 1235, 1239 (8th Cir. 1982). The Court sees no indication in the evidence before it that Hunter's non-verbal waiver was invalid.[4] Instead, Hunter's actions and words signified that he intended to waive his *Miranda* rights.

The Court rejects both of Hunter's arguments and concludes Hunter knowingly and voluntarily waived his *Miranda* rights. Accordingly, Hunter's motion to suppress should be denied.

---

[4] To the extent Hunter argues that his statement "'About what's going on'—what you mean?" signals that he had not understood the warnings, the Court disagrees. Hunter's statement was clearly in response to Schroeder's question immediately prior—"You want to talk to me about what's going on?"—and not related to the *Miranda* warnings he had just received.

### III. Recommendation

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Michael Eugene Hunter's Motion to Suppress Statements [ECF No. 41] be **DENIED**.

Dated: November 6, 2020
        s/ *Hildy Bowbeer*
        HILDY BOWBEER
        United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.